Modified.

## LOCKE v. FULLER.

## FULLER v. LOCKE.

Patent Appeals Nos. 2958, 2959.

Court of Customs and Patent Appeals.
May 23, 1932.

Charles W. Hills and Myron G. Clear, both of Washington, D. C. (Charles W. Hills, Jr., of Washington, D. C., and Charles F. Meroni and M. R. Chambers, both of Chicago, Ill., of counsel), for Locke.

O. H. Eschholz, of East Pittsburgh, Pa. (Wesley G. Carr, of East Pittsburgh, Pa., of counsel), for Fuller.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

These are appeals from the decision of the Board of Appeals of the United States Patent Office in an interference proceeding in which Locke was awarded priority of invention as to the subject-matter of counts 1, 2, 3, 8, 9, 10, 11, and 13, and priority of invention was awarded to Fuller as to the subject-matter of counts 4, 5, 6, 7, 12 and 14.

The counts were taken from the Fuller patent which had been assigned to the Westinghouse Electric & Manufacturing Company, and were copied in an application for reissue of a patent to Locke under which the Hub Electric Company is the exclusive licensee.

Locke appeals from the decision of the Board awarding priority to Fuller as to counts 4, 5, 6, 7, 12, and 14, and Fuller has appealed from the same decision which awarded priority to Locke in counts 2, 3, 8, 9, 10, 11, and 13.

Priority in the subject-matter of count 1 was, by the Board of Appeals, awarded to Locke. No appeal is taken from the Board's decision as to count 1, and consideration of this count is not required by us.

The sole question in the case, which we need to consider, is: Do the counts of the interference read upon the Locke disclosure— can Locke make the counts?

The Examiner of Interferences and the Law Examiner held that Locke could make all the counts and awarded priority to Locke in the subject-matter thereof. Upon appeal to the Board of Appeals, the board held with the examiner of Interferences and the Law Examiner that Locke could make counts 1, 2, 3, 8, 9, 10, 11, and 13, but that he could not make counts 4, 5, 6, 7, 12, and 14, and, therefore, reversed the decision appealed from in this respect, and awarded priority as to counts 4, 5, 6, 7, 12, and 14 to Fuller.

There is a single record for both appealed cases, and both are briefed and argued togeth-

er, and will be included in one decision by this court.

The invention relates to a theater lighting system in which a plurality of lighting circuits are positioned in various portions of the stage with separate circuits, at any one position, having different colored lamps. The different circuits and colors for the different scenes may be preselected, that is, while one scene is being produced, another set of switches is arranged to throw on certain lights for the next scene without interfering with the lights being used in the first or any other scene. The whole arrangement is also designed to prevent the flow of so-called "sneak" currents through lamp circuits other than those which pertain to the active scenes.

We think claims 2 and 4 are illustrative, and they are as follows:

"2. In a theatre-lighting system, the combination with a supply circuit having a plurality of separately operable switches and a plurality of load circuits, of controlling devices for each of said circuits, *and means including a group of individually adjustable switches for each load circuit,* each of which is associated with a different separately operable switch for selectively controlling the connection of said source to said controlling devices whereby desired combinations of said lighting circuits may be preselected for a series of scenes and whereby the circuits of each selected combination may be energized without disturbing the adjustment for preceding or subsequent scenes." (Italics ours.)

"4. In combination in a theatre-lighting system, a plurality of groups of switch means, a source of electric energy, *a common control means for the switch means of each group,* a plurality of lighting currents controlled by said switch means, a common connection from each lighting circuit to one switch means of each group, and a means individual to each switch means adapted to determine whether actuation of its said control means shall cause current flow through said switch means." (Italics ours.)

Count 2 is illustrative of the counts in which priority of invention was awarded to Locke, and count 4 is illustrative of the character of the counts awarded Fuller.

We have italicized the controverted portions of the counts.

The Board concluded that the Law Examiner properly held that the term in count 2 "and means including a group of individually adjustable switches for each load circuit" read upon Locke's structure as shown in figure 1a. Counts 3, 8, 9, 10, 11, and 13

contain substantially the same language as the italicized phrase in count 2. Having held that such language read upon Locke's disclosure, and it being conceded that, if he could make the counts, he was prior to Fuller in invention, the Board awarded priority in this group of counts to Locke.

The Board held that the term "a common control means for the switch means of each group," which is found in count 4 (similar language being found in counts 5, 6, 7, 12, and 14), did not read upon the Locke structure, and that Locke could not make such counts, and, therefore, awarded priority in this group of counts to Fuller.

The construction of the theater lighting system involved in both applications is somewhat difficult to understand and more difficult to explain, and we do not regard it as necessary to set out in detail the various elements of the different structures.

In discussing the counts in which priority of invention was awarded to Fuller, the Board said:

"Count 4 recites a 'common, control means for the switch means of each group' as well as a common connection from each lighting circuit to one switch means of each group 'and means individual to each switch means adapted to determine whether actuation of its said control means shall cause current flow.' The Law Examiner holds switch 82 a common control means for group 1 of switches. We do not consider this language can be so broadly construed. To control a switch, we consider means to effect a movement of said switch. To control the current passing through the switch we do not consider as controlling the switch which is either closed or open independent of the current in the line to the switch. The common connection from each lighting circuit to one switch means of each group does read, as the Law Examiner holds, on the — and — lines between load and the switches 3. Not finding any control means in Locke, we do not find the 'means adapted to determine whether actuation of its said control means shall cause current flow.'

"Count 5 reads 'means insuring common actuation of the switch means of a group.' Count 6 reads 'a common control means for the switch means of each group.' Count 7 reads 'means insuring common actuation of the switch means of a group.' Count 5 also has a clause 'adapted to determine whether actuation of its said first said means shall cause current flow.' In counts 6 and 7 this clause reads 'adapted to determine whether

actuation of its said control means shall cause current flow.' These expressions mean to us, as held in connection with count 4, mechanism for actually changing the position of the switch or effecting an opening or closing of same and not merely controlling the flow or current through the switches when closed. We consider that claims 4, 5, 6 and 7 are not readable on the Locke construction.

"Count 12 recites a common control means for the switch means of each group as well as the expression 'adapted to determine whether actuation of its control means shall cause current to flow.' Count 14 uses the language 'means insuring the common actuation of the switch means' and a similar closing expression to that in count 12. For reasons above stated, we do not consider that these counts read on Locke."

■ We agree that Locke does not show the common control means referred to, and we affirm the action of the Board in awarding priority of invention of the counts of this group to Fuller.

As to counts, 2, 3, 8, 9, 10, 11, and 13, we find ourselves in disagreement with the finding of the Board.

Counts 2, 3, 8, 9, and 11 are characterized by a common element which is expressed in count 2 in the phrase "and means including a group of individually adjustable switches for each load circuit."

In counts 10 and 13 is found language directed to the same subject-matter as is above referred to in counts 2, 3, 8, 9, and 11. In count 10 is found the phrase, "a plurality of means adapted to be preset to interrupt the circuit between said source and each load circuit." In count 13 is found the phrase, "means individual to each switch means of each group to determine whether current from said source shall flow through the said switch means," etc.

■ The allowance of priority to Locke of this group of counts depends upon whether or not the phrase in each count above referred to reads upon the Locke disclosure. We do not think it does.

The Board, in affirming the decision, appealed from as to the right of Locke to make this group of counts, construed the term "adjustable" as applicable to the movement of a switch from closed position to open position, and conversely from open position to closed position, holding that switches a, b, c, and d in figure 1a were individually adjustable, and said: " * * * For instance a series of switches may be said to be adjusted or set in open or closed position before the current to be supplied to the various circuits controlled by said switches is turned on."

In determining what "individually adjustable" means, and what the quoted phrases in counts 10 and 13 mean, we think it proper to examine the Fuller drawings and disclosure, since the count originated in his application. The individually adjustable switches 58 in Fuller are adjusted preliminary to the circuit opening and circuit closing movements. Each switch 58 is adjustable by a presetting action involving the use of a screw or other adjusting device which throws the circuit out of contact with certain particular connections, irrespective of any further circuit closing movement.

The same features in Locke, claimed to respond to this language, are switches a, b, c, and d, shown in figure 1a. These are merely switches (no particular kind indicated) and are movable to make or break a connection between two controls. It is not thought that merely opening or closing a switch constitutes individually adjusting the same for each load circuit as is contended for by Locke.

We, therefore, conclude that Locke cannot make counts 2, 3, 8, 9, and 11. For substantially the same reasons as apply to counts 2, 3, 8, 9, and 11, we think that the above-quoted phrases found in counts 10 and 13 do not read on Locke's disclosure. The Board erred in affirming the action of the Examiner of Interferences in awarding priority to Locke in this group of counts.

We have examined all the errors assigned by the parties on both sides and find no reversible error therein except as is herein indicated, and a further discussion of the various questions raised is deemed unnecessary.

The decision of the Board of Appeals is, therefore, modified. It is affirmed as to the award of priority of invention to Fuller in counts 4, 5, 6, 7, 12, and 14, and it is reversed as to its award to Locke of priority in counts 2, 3, 8, 9, 10, 11, and 13.